# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

## CASE NO.: _____

|  |  |
|---|---|
| DAVID RAMIREZ, on behalf of himself and all others similarly situated,<br><br>  Plaintiff,<br><br>v.<br><br>INDEPENDENT LIVING SYSTEMS, LLC,<br><br>  Defendant. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff David Ramirez ("Plaintiff") brings this Class Action Complaint ("Complaint") against Defendant Independent Living Systems, LLC ("ILS" or "Defendant") as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge as to his own actions and his counsels' investigation, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.  This is a civil action seeking monetary damages, and injunctive and declaratory relief from ILS, a Florida-based company that "offers a comprehensive range of turnkey payer services including clinical and third-party administrative services to" healthcare providers and

organizations,[1] arising from its failure to safeguard the Personally Identifiable Information[2] ("PII") and Personal Health Information ("PHI") (together, "Private Information") of its customers, resulting in unauthorized access to its information systems and email accounts from June 30 to July 5, 2022, and the compromised and unauthorized disclosure of that Private Information, causing widespread injury and damages to Plaintiff and the proposed Class Members.

2.      As explained in detail herein, on information and belief, on or around July 5, 2022, ILS's information technology systems were unauthorizedly accessed by unknown third parties, who were able to gain access to information stored on the ILS network (the "Data Breach").[3]

3.      As a result of the Data Breach, which ILS failed to prevent, the Private Information of ILS's customers, including Plaintiff and the proposed Class Members, including their names, Social Security Numbers, and health insurance information, were disclosed and subjected to continued access without authorization.[4]

4.      Defendant's investigation concluded that the Private Information compromised in the Data Breach included Plaintiff's and approximately 4,200,000 other individuals' information.[5]

---

[1] https://ilshealth.com/about-ils/ (last accessed Mar. 16, 2023).

[2] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, according to Defendant, not every type of information included in that definition was compromised in the breach.

[3] *See* Lewis Brisbois Bisgaard & Smith LLP, Letter to Maine Attorney General, August 29, 2022, and attached sample Notice ("Data Breach Notice"), available at https://apps.web.maine.gov/online/aeviewer/ME/40/c718f63f-cda3-4f7e-b064-649da77121c0.shtml (last accessed October 2, 2022), attached as **Exhibit A**.

[4] *Id.*

[5] https://apps.web.maine.gov/online/aeviewer/ME/40/aacdb720-e082-4ef6-b7e6-f03280b2c4ec.shtml (last accessed Mar. 16, 2023).

5.      Moreover, although Defendant failed to disclose the date it discovered the Data Breach, Defendant waited *over eight months* after the Data Breach's occurrence (from July 5, 2022 to March 14, 2023) to notify Plaintiff and Class Members of the Data Breach and inform them that their Private Information was compromised. During this time, Plaintiff and Class Members were unaware that their sensitive Private Information had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm.

6.      ILS's failure to safeguard customers' highly sensitive Private Information as exposed and unauthorizedly disclosed in the Data Breach, and to promptly determine the scale of the Data Breach, violates its common law duty, Florida law, and Defendant's implied contract with its customers to safeguard their Private Information.

7.      Plaintiff and the Class Members now face a lifetime risk of identity theft due to the nature of the information lost, including customers' names and Social Security numbers, which they cannot change, and which cannot be made private again.

8.      ILS's harmful conduct has injured Plaintiff and Class Members in multiple ways, including: (i) the lost or diminished value of their Private Information; (ii) costs associated with the prevention, detection, and recovery from identity theft, tax fraud, and other unauthorized use of their data; (iii) lost opportunity costs to mitigate the Data Breach's consequences, including lost time; and (iv) emotional distress associated with the loss of control over their highly sensitive Private Information.

9.      ILS's failure to protect customers' Private Information harms thousands of customers, causing Plaintiff to seek relief on a class wide basis.

10.     On behalf of himself and the Classes preliminarily defined below, Plaintiff brings

causes of action against ILS for negligence, negligence *per se*, breach of implied contract, and violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.204, *et seq.* ("FDUTPA"), seeking an award of monetary damages, and injunctive and declaratory relief, as a result of Defendant's failure to adequately protect their highly sensitive Private Information.

## PARTIES

11.    Plaintiff is a resident and citizen of Florida, currently residing in Tampa, Florida. Plaintiff received the Notice Letter, via U.S. mail, directly from Defendant, dated March 14, 2023.[6]

12.    Plaintiff provided his Private Information, indirectly or directly, to Defendant on the condition that it be maintained as confidential and with the understanding that Defendant would employ reasonable safeguards to protect his Private Information.

13.    If Plaintiff had known that Defendant would not adequately protect his Private Information, he would not have allowed Defendant to maintain this sensitive Private Information.

14.    Defendant is a Florida-based company with its principal place of business located at 4601 NW 77th Avenue, Miami, Florida 33166.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.[7]

16.     This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in

---

[6] Ex. A.
[7] According to the report submitted to the Office of the Maine Attorney General, 238 Maine residents were impacted. *See* https://apps.web.maine.gov/online/aeviewer/ME/40/aacdb720-e082-4ef6-b7e6-f03280b2c4ec.shtml (last accessed Mar. 16, 2023).

and emanated from this District. Defendant has sufficient contacts in Florida, as it conducts a significant amount of its business in the state of Florida.

17.     Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

## FACTUAL BACKGROUND

### Defendant's Business

18.     ILS is a Florida-based company that "offers a comprehensive range of turnkey payer services including clinical and third-party administrative services to" healthcare providers and organizations.[8]

19.     Plaintiff and Class Members are current or former patients of healthcare providers and organizations that utilize Defendant's services ("Healthcare Providers").

20.     In order to obtain healthcare services from their Healthcare Providers, Plaintiff and Class Members were required to provide sensitive and confidential Private Information, including their names, dates of birth, health information, insurance information, and other sensitive information, that would be held by Defendant in its computer system.

21.     The information held by Defendant in its computer systems at the time of the Data Breach included the unencrypted Private Information of Plaintiff and Class Members.

22.     Upon information and belief, Defendant made promises and representations to its clients that the Private Information collected from their patients, including Plaintiff and Class Members, would be kept safe, confidential, that the privacy of that information would be maintained, and that Defendant would delete any sensitive information after it was no longer required to maintain it.

---

[8] https://ilshealth.com/about-ils/ (last accessed Mar. 16, 2023).

23.     Indeed, Defendant's Company Privacy Policy provides that: "[w]e are required by law to maintain the privacy and security of your protected health information. We implement a variety of security measures to maintain the safety of your personal information when you access your personal information."[9]

24.     Plaintiff and Class Members provided their Private Information to Defendant (via Defendant's clients) with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

25.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiff and Class Members relied on the sophistication of Defendant to keep their Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

26.     Defendant had a duty to adopt reasonable measures to protect the Private Information of Plaintiff and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep consumer's Private Information safe and confidential.

27.     Defendant had obligations under the FTC Act, HIPAA, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

---

[9] https://ilshealth.com/privacy-policy/ (last accessed Mar. 22, 2023).

28.     Defendant derived a substantial economic benefit from collecting Plaintiff's and Class Members' Private Information. Without the required submission of Private Information, Defendant could not perform the services it provides.

29.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

**The Data Breach**

30.     On or about March 14, 2023, Defendant began sending Plaintiff and other victims of the Data Breach a Notice of Data Incident letter ("Notice Letter") (attached hereto as **Exhibit A**), informing them that:

> **What Happened?** On July 5, 2022, we experienced an incident involving the inaccessibility of certain computer systems on our network. We responded to the incident immediately and began an investigation with the assistance of outside cybersecurity specialists. Through our response efforts, we learned that an unauthorized actor obtained access to certain ILS systems between June 30 and July 5, 2022. During that period, some information stored on the ILS network was acquired by the unauthorized actor, and other information was accessible and potentially viewed. Upon containing the incident and reconnecting our computer systems, we began to review the potentially affected data to determine whether it contained any personal information or PHI, and if so, to whom such information related.
>
> **What Information Was Involved?** As previewed above, we conducted a comprehensive data review exercise to understand the scope of potentially affected information and identify the individuals to whom such information relates. On January 17, 2023, we received the results of this review and determined that the following types of information related to you were included in one or more files acquired by the unauthorized actor or present in one or more files that resided on an area of the ILS network that was accessed by the unauthorized actor: name, date of birth, Medicare identification, Medicaid identification, Food Delivery Information, and other health insurance information.

31.     Omitted from the Notice Letter were the date that Defendant discovered the Data Breach, details of the root cause of the Data Breach, the vulnerabilities exploited, why it took *over*

*eight months* to inform impacted individuals after the Data Breach's occurrence, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

32.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

33.     Further, the Notice Letter makes clear that ILS cannot even determine the full scope of the Data Breach, as it has been unable to determine exactly what information was stolen and when.

34.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

35.     The attacker accessed and acquired files in Defendant's computer systems containing unencrypted Private Information of Plaintiff and Class Members, including their names, date of birth, health information, and health insurance information. Plaintiff's and Class Members' Private Information was accessed and stolen in the Data Breach.

36.     Plaintiff further believes his Private Information, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

**Data Breaches Are Preventable.**

37.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[10]

38.     To prevent and detect cyber-attacks and/or ransomware attacks Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

---

[10] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Aug. 23, 2021).

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[11]

39.    To prevent and detect cyber-attacks Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer.** Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on

---

[11] *Id.* at 3-4.

any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[12]

40.     To prevent and detect cyber-attacks or ransomware attacks Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs

---

[12] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at:* https://us-cert.cisa.gov/ncas/tips/ST19-001 (last visited Oct. 17, 2022).

- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[13]

41. Defendant had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect Plaintiff's and Class Members' Private Information.

42. Given that Defendant was storing the sensitive Private Information of current and former patients of its clients, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

43. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the Private Information of over 4,200,000 patients, including that of Plaintiff and Class Members.

**ILS Acquires, Collects, and Stores Plaintiff's and Class Members' Private Information.**

44. As a condition to obtain medical services from Defendant's clients, Plaintiff and Class Members were required to give their sensitive and confidential Private Information to Defendant.

---

[13] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Mar. 22, 2023).

45.     Defendant retains and stores this information and derives a substantial economic benefit from the Private Information that it collects. But for the collection of Plaintiff's and Class Members' Private Information Defendant would be unable to perform its services.

46.     By obtaining, collecting, and storing the Private Information of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known that they were responsible for protecting the Private Information rom disclosure.

47.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Defendant to keep their Private Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

48.     Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiff and Class Members.

49.     Upon information and belief, Defendant made promises to Plaintiff and Class Members to maintain and protect their Private Information, demonstrating an understanding of the importance of securing Private Information.

50.     Indeed, Defendant's Company Privacy Policy provides that: "[w]e are required by law to maintain the privacy and security of your protected health information. We implement a variety of security measures to maintain the safety of your personal information when you access your personal information."[14]

---

[14] https://ilshealth.com/privacy-policy/ (last accessed Mar. 22, 2023).

51.     Defendant's negligence in safeguarding the Private Information of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

**ILS Knew or Should Have Known of the Risk Because Healthcare Entities in Possession of Private Information are Particularly Suspectable to Cyber Attacks.**

52.     Data thieves regularly target healthcare entities like Defendant's due to the highly sensitive information that they maintain. Defendant knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

53.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting healthcare entities like Defendant that collect and store Private Information and other sensitive information, preceding the date of the breach.

54.     In light of recent high profile data breaches at other industry-leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.

55.     As a custodian of Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

56.    Defendant's Company Privacy Policy evidences its knowledge of the foreseeable risks of Data Breaches, like the one it experienced, stating: "[w]e will promptly notify you if a breach occurs that may have compromised the privacy or security of your information."[15]

57.    For example, of the 1,862 recorded data breaches in 2021, 330 of them, or 17.7%, were in the medical or healthcare industry.[16]

58.    The 330 reported breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[17]

59.    Entities in custody of protected health information ("PHI") and/or medical information reported the second largest number of data breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[18] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that victims were often forced to pay out of pocket costs for healthcare they did not receive in order to restore coverage.[19] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the patients were never able to resolve their identity theft at all.

---

[15] https://ilshealth.com/privacy-policy/ (last accessed Mar. 22, 2023).
[16] 2021 Data Breach Annual Report (ITRC, Jan. 2022) (available at https://notified.idtheftcenter.org/s/), at 6.
[17] *Id.*
[18] *See* Identity Theft Resource Center, *2018 End -of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/2018-end-of-year-data-breach-report/ (last visited Oct. 17, 2022).
[19] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited Oct. 17, 2022).

Data breaches and identity theft have a crippling effect on individuals, and detrimentally impact the economy as a whole.[20]

60.    Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

61.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

62.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to potentially *millions* of individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

63.    In the Notice Letter, Defendant makes an offer to provide credit and identity monitoring services for a period of no longer than 24 months to Class Members. This is wholly inadequate to compensate Plaintiff and Class Members as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiff and Class Members' Private Information. Moreover, once this service expires, Plaintiff and Class Members will be forced to pay out of pocket for necessary identity monitoring services.

---

[20] *See id.*

64.     Defendant's offering of credit and identity monitoring establishes that Plaintiff's and Class Members' sensitive Private Information *was* in fact affected, accessed, compromised, and exfiltrated from Defendant's computer systems. Moreover, Defendant's offer indicates that it recognizes that Plaintiff and Class Members are at a present and continuing risk of identity theft and fraud as a result of the Data Breach.

65.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

66.     The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen—particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

67.     As a healthcare entity in possession of its client's patients' and former patients' Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

**ILS Fails to Comply with FTC Guidelines**

68.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

69.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[21]

70.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[22]

71.     The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

72.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

---

[21] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Mar. 22, 2023).
[22] *Id.*

73.     These FTC enforcement actions include actions against healthcare entities, like Defendant. *See, e.g., In the Matter of LabMD, Inc., a corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

74.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

75.     Defendant failed to properly implement basic data security practices.

76.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

77.     Upon information and belief, Defendant was at all times fully aware of its obligation to protect the Private Information of its patients; Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

**ILS Fails to Comply with HIPAA Guidelines.**

78.     Defendant is a covered business associate under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

79.     Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[23] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

80.     HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

81.     HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

82.     HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

83.     "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

84.     HIPAA's Security Rule requires Defendant to do the following:

---

[23] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

85.     HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

86.     HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic PHI that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

87.     The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and *in no case later than 60 days following discovery of the breach*."[24]

88.     HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the

---

[24] Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added).

covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

89.     HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of PHI in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

90.     HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[25] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[26]

**ILS Fails to Comply with Industry Standards.**

91.     As noted above, experts studying cyber security routinely identify entities in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information which it collects and maintains.

---

[25] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html.
[26] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html.

92.     Several best practices have been identified that, at a minimum, should be implemented by healthcare and healthcare-support entities in possession of Private Information, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

93.     Other best cybersecurity practices that are standard in the healthcare and healthcare-support industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

94.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

95.     The foregoing frameworks are existing and applicable industry standards in the healthcare and healthcare-support industry, and upon information and belief, Defendant failed to

comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

**ILS Owed Plaintiff and Class Members a Duty to Safeguard their Private Information.**

96.     In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

97.     Defendant owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information within its computer systems on how to adequately protect Private Information.

98.     Defendant owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

99.     Defendant owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

100.     Defendant owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

101.     Defendant owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

**The Data Breach Increases Plaintiff's and Class Members' Risk of Identity Theft.**

102.     The unencrypted Private Information of Plaintiff and Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

103.     Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members.

104.     Simply put, unauthorized individuals can easily access the Private Information of Plaintiff and Class Members as a result of the Data Breach.

105.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

106.     Plaintiff's and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

**Loss of Time to Mitigate the Risk of Identity Theft and Fraud**

107.     As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports

could expose the individual to greater financial harm—yet, the resource and asset of time has been lost.

108.    Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must, as Defendant's Notice Letter instructs them, "remain vigilant"[27] and monitor their financial accounts for many years to mitigate the risk of identity theft.

109.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as changing passwords and resecuring their own computer systems.

110.    Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[28]

111.    Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[29]

112.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches

---

[27] Notice Letter.
[28] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.
[29] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited Mar. 22, 2023).

("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

**Diminution of Value of Private Information.**

113.    Private Information are valuable property rights.[30] Their value is axiomatic, considering the value of Big Data in corporate America and that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates, beyond doubt, that Private Information have considerable market value.

114.    The Private Information stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply cancelling credit or debit cards and obtaining replacements. The information stolen in the Data Breach— most notably name and Social Security Number—is difficult, if not impossible, to change.

115.    This kind of data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information… [is] worth more than 10x on the black market."[31]

116.    Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[32]

---

[30] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," at 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Mar. 22, 2023) ("GAO Report").
[31] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hackpersonal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.
[32] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has

117.     An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[33] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[34,35] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[36]

118.     As a result of the Data Breach, Plaintiff's and Class Members' Private Information which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

119.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

120.     The fraudulent activity resulting from the Data Breach may not come to light for years.

---

quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[33] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Mar. 22, 2023).

[34] https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[35] https://datacoup.com/

[36] https://digi.me/what-is-digime/

121. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

122. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to potentially millions of individuals' detailed Private Information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

123. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

**Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary.**

124. Given the type of targeted attack in this case, the sophisticated criminal activity, the volume of data compromised in the Data Breach, and the sensitive type of Private Information involved in this Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes –*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

125. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

126.    Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

127.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft resulting from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

**Loss of the Benefit of the Bargain**

128.    Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendant and/or its agents for the provision of its services (via Defendant's clients, which are healthcare providers), Plaintiff and other reasonable consumers understood and expected that they were, in part, paying for the service and necessary data security to protect the Private Information when, in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

**Plaintiff's Experience**

129.    Plaintiff obtained medical services at a medical facility that was affiliated with Defendant. In order to obtain medical services from the Defendant-affiliated medical facility, he was required to provide his Private Information, whether directly or indirectly, to Defendant.

130.    Upon information and belief, at the time of the Data Breach—from June 30, 2022 to July 5, 2022—Defendant retained Plaintiff's Private Information in its system.

131. Plaintiff is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the Internet or any other unsecured source.

132. Plaintiff received the Notice Letter, by U.S. mail, directly from Defendant, dated March 14, 2023. According to the Notice Letter, Plaintiff's Private Information was improperly accessed and obtained by unauthorized third parties, including his name, date of birth, Medicare identification, Medicaid identification, Food Delivery Information, and other health insurance information.

133. As a result of the Data Breach, and at the direction of Defendant's Notice Letter, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including changing his passwords and resecuring his own computer systems. Plaintiff has spent significant time dealing with the Data Breach, valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

134. As a result of the Data Breach, Plaintiff fears for his personal financial security and uncertainty over what medical information was revealed in the Data Breach. He is experiencing feelings of anxiety, sleep disruption, stress, and fear because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

135. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

136. As a result of the Data Breach, Plaintiff is presently at risk and will continue to be at increased risk of identity theft and fraud for years to come.

137.    Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

138.    Pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4), Plaintiff brings this action on behalf of himself and on behalf of all members of the proposed Classes defined as:

**Nationwide Class:** All individuals residing in the United States whose Private Information and/or PHI was accessed and/or acquired by an unauthorized party as a result of the data breach reported by Defendant on or about March 14, 2023.

**Florida Sub-Class:** All individuals residing in Florida whose Private Information and/or PHI was accessed and/or acquired by an unauthorized party as a result of the data breach reported by Defendant on or about March 14, 2023.

139.    Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

140.    Plaintiff reserves the right to amend the definitions of the Classes or add a Class or Sub-class if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

141.    **Numerosity**: The members of the Classes are so numerous that joinder of all members is impracticable, if not completely impossible. At least 4,200,000 individuals were notified by Defendant of the Data Breach, according to the breach report submitted to Maine

Attorney General's Office.[37] The Classes are apparently identifiable within Defendant's records, and Defendant has already identified these individuals (as evidenced by sending them breach notification letters).

142.     Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting solely individual members of the Classes. Among the questions of law and fact common to the Classes that predominate over questions which may affect individual Class members, including the following:

a.     Whether and to what extent Defendant had a duty to protect the Private Information and/or PHI of Plaintiff and Class Members;

b.     Whether Defendant had respective duties not to disclose the Private Information and/or PHI of Plaintiff and Class Members to unauthorized third parties;

c.     Whether Defendant had respective duties not to use the Private Information and/or PHI of Plaintiff and Class Members for non-business purposes;

d.     Whether Defendant failed to adequately safeguard the Private Information and/or PHI of Plaintiff and Class Members;

e.     Whether and when Defendant actually learned of the Data Breach;

f.     Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information and/or PHI had been compromised;

---

[37] https://apps.web.maine.gov/online/aeviewer/ME/40/aacdb720-e082-4ef6-b7e6-f03280b2c4ec.shtml (last accessed Mar. 22, 2023).

g.   Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information and/or PHI had been compromised;

h.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.   Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.   Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct;

k.   Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

143.   **Typicality**: Plaintiff's claims are typical of those of the other members of the Classes because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Classes.

144.   This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge

of these policies hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiff.

145. **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that he has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages he has suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

146. **Superiority**: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that millions of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

147. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources;

the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

148.   Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

149.   Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

150.   Further, Defendant has acted on grounds that apply generally to the Classes as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

    a.   Whether Defendant failed to timely notify the Plaintiff and the Classes of the Data Breach;

    b.   Whether Defendant owed a legal duty to Plaintiff and the Classes to exercise due care in collecting, storing, and safeguarding their Private Information;

    c.   Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

    d.   Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e.  Whether Defendant's failure to institute adequate protective security measures amounted to breach of an implied contract;

f.  Whether Defendant's failure to institute adequate protective security measures violated FDUTPA;

g.  Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

h.  Whether adherence to HIPAA and FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

### COUNT I
### Negligence
### (On Behalf of Plaintiff and the Nationwide Class)

151.  Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 150.

152.  Defendant's clients require their patients, including Plaintiff and Class Members, to submit non-public Private Information in the ordinary course of providing medical services.

153.  Defendant gathered and stored the Private Information of Plaintiff and Class Members as part of its business of soliciting its services to its clients and its clients' patients, which solicitations and services affect commerce.

154.  Plaintiff and Class Members entrusted Defendant with their Private Information with the understanding that Defendant would safeguard their information.

155.    Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information wrongfully disclosed.

156.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

157.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

158.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its patients. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential Private Information, a necessary part of being patients of Defendant's clients.

159.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

160.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class.

161.    Additionally, Defendant had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

162.    Defendant had and continues to have a duty to adequately disclose that the Private Information of Plaintiff and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

163.    Defendant breached its duties, thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b.    Failing to adequately monitor the security of their networks and systems;

c.    Failure to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

d.    Allowing unauthorized access to Class Members' Private Information;

e.    Failing to detect in a timely manner that Class Members' Private Information had been compromised;

f.    Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

g.   Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

164.   A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

165.   It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in both the financial services and medical industry.

166.   Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if the Private Information were wrongfully disclosed.

167.   Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems.

168.   It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

169.   Plaintiff and the Class had no ability to protect their Private Information that was in, and likely remains in, Defendant's possession.

170.   Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

171.     Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

172.     Defendant has admitted that the Private Information of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

173.     But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

174.     There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The Private Information of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

175.     As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of their Private Information; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains in Defendant's possession and is subject to further

unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

176.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

177.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

178.    Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and insecure manner.

179.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

180.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
### Negligence *Per Se*
### (On behalf of Plaintiff and the Nationwide Class)

181.    Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 150.

182.    Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

183.    Pursuant to HIPAA, 42 U.S.C. § 1302d, *et seq*., Defendant had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

184.    Pursuant to HIPAA, Defendant had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* definition of encryption at 45 C.F.R. § 164.304.

185.    Defendant breached its duties to Plaintiff and Class Members under the FTC Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

186.    Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se.*

187.    The injuries to Plaintiff and Class Members resulting from the Data breach were directly and indirectly caused by Defendant's violation of the statutes described herein.

188.    Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act and HIPAA were intended to protect and the type of harm that resulted from the Data Breach was the type of harm these statues were intended to guard against.

189.    But for Defendant's wrongful and negligent breach of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

190.     The injuries and harms suffered by Plaintiff and Class Members were the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

191.     As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injuries and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

## COUNT III
### Breach of Implied Contract
### (On Behalf of Plaintiff and the Nationwide)

192.     Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 150.

193.     Defendant offered to provide services to its clients, which are Plaintiff and Class Members' health care providers, in exchange for payment.

194.     Defendant also required Plaintiff and the Class Members to provide Defendant with their Private Information to receive services.

195.     In turn, Defendant impliedly promised to protect Plaintiff's and Class Members' Private Information through adequate data security measures.

196.     Defendant recognized its implied promise in its admission to the Maine Attorney General, stating that Defendant "takes the protection of all sensitive information within its possession very seriously and is taking steps to prevent similar incidents from occurring in the future."[38]

---

[38] *See* Ex. A.

197.    Plaintiff and the Class Members accepted Defendant's offer by providing Private Information to Defendant in exchange for receiving Defendant's services, and then by paying for and receiving the same.

198.    Implicit in the parties' agreement was that Defendant would provide Plaintiff and members of the Class with prompt and adequate notice of all unauthorized access or theft of their Private Information.

199.    Plaintiff and the members of the Class would not have entrusted their Private Information to Defendant but-for the above-described agreement with Defendant.

200.    Defendant materially breached its agreement(s) with Plaintiff and members of the Class by failing to safeguard such Private Information, violating industry standards necessarily incorporated in the agreement, and failing to timely notify them promptly of the intrusion into its email information technology systems that compromised and unauthorizedly disclosed said information.

201.    Plaintiff and members of the Class have performed under the relevant agreements, or such performance was waived by the conduct of Defendant.

202.    The covenant of good faith and fair dealing is an element of every contract. All such contracts impose on each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract along with its form.

203.    Subterfuge and evasion violate the obligation of good faith in performance even

when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

204.     Defendant's conduct as alleged herein also violated the implied covenant of good faith and fair dealing inherent in every contract.

205.     The losses and damages Plaintiff and Class Members sustained that are described herein were the direct and proximate result of Defendant's breach of the implied contracts with them, including breach of the implied covenant of good faith and fair dealing.

**COUNT IV**
**Violation of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. §§ 501.204, *et seq.***
**(On behalf of Plaintiff and the Florida Sub-Class)**

206.     The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.204, *et seq.*, provides that "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

207.     In connection with providing services involving PHI, Defendant represented, directly or indirectly, expressly or by implication to consumers, Plaintiff and the proposed Florida Sub-Class Members, that it would safeguard their PHI entrusted to Defendant, including but limited to, by undertaking adequate security measures consistent with industry standards, and by adequately training employees.

208.     As outlined above, Defendant knew or should have known that its data security measures were inadequate.

209.     As a result, Defendants representations of undertaking adequate data security measures to safeguard Plaintiff's and the proposed Florida Sub-Class Members' PHI as set forth above were false and misleading and constitute deceptive acts or practices in violation of Section 501.204 of the Florida Deceptive and Unfair Trade Practices Act.

210.    As a result of the above violations of the Florida Deceptive and Unfair Trade Practices Act, Plaintiff and the proposed Class Members have suffered injury and damages as set forth herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and Class Members, requests judgment against Defendant and that the Court grants the following:

A.    For an order certifying the Classes, as defined herein, and appointing Plaintiff and her Counsel to represent the Classes;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.    requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws.

iii.    requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such

information when weighed against the privacy interests of Plaintiff and
Class Members;

iv.    requiring Defendant to implement and maintain a comprehensive
information security program designed to protect the confidentiality and
integrity of the Private Information of Plaintiff and Class Members;

v.    prohibiting Defendant from maintaining the Private Information of Plaintiff
and Class Members on a cloud-based database;

vi.    requiring Defendant to engage independent third-party security
auditors/penetration testers as well as internal security personnel to
conduct testing, including simulated attacks, penetration tests, and audits on
Defendant's systems on a periodic basis, and ordering Defendant to
promptly correct any problems or issues detected by such third-party
security auditors;

vii.    requiring Defendant to engage independent third-party security auditors
and internal personnel to run automated security monitoring;

viii.    requiring Defendant to audit, test, and train its security personnel
regarding any new or modified procedures;

ix.    requiring Defendant to segment data by, among other things, creating
firewalls and access controls so that if one area of Defendant's network is
compromised, hackers cannot gain access to other portions of Defendant's
systems;

x.    requiring Defendant to conduct regular database scanning and securing
checks;

xi.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the Private Information of Plaintiff and Class Members;

xii.    requiring Defendant to conduct internal training and education routinely and continually, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.    requiring Defendant to implement a system of tests to assess its employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting Private Information;

xiv.    requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.    requiring Defendant to meaningfully educate all Class Members about

the threats that they face as a result of the loss of their confidential Private

Information to third parties, as well as the steps affected individuals must

take to protect

themselves; and

xvi.    requiring Defendant to implement logging and monitoring programs

sufficient to track traffic to and from Defendant's servers; and for a period

of 10 years, appointing a qualified and independent third-party assessor to

conduct an attestation on an annual basis to evaluate Defendant's

compliance with the terms of the Court's final judgment, to provide such

report to the Court and to counsel for the class, and to report any deficiencies

with compliance of the Court's final judgment.

D.    For an award of damages, including actual, statutory, and consequential damages,

as allowed by law in an amount to be determined by a jury at trial;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury of all issues so triable.


Dated: March 22, 2023.        Respectfully Submitted,

By: *Jeff Ostrow*
Jeff Ostrow FBN 121452
Kristen Lake Cardoso FBN 44401
Steven Sukert FBN 1022912
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd., Suite 500

Fort Lauderdale, Florida 33301
Telephone: 954-525-4100
ostrow@kolawyers.com
cardoso@kolawyers.com
sukert@kolawyers.com

*Attorneys for Plaintiff and the Putative Class*